UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GLOBAL AEROSPACE, INC.,

                            NO. CIV. S-06-594 LKK/KJM

        Plaintiff,

  v.                               O R D E R

ARTHUR J. GALLAGHER & CO.
INSURANCE BROKERS OF
CALIFORNIA, INC.,

        Defendant.
                           /

    This action involves an insurance coverage dispute regarding a plane crash. Plaintiff Global Aerospace, an insurer, has brought suit against defendant Arthur J. Gallagher & Co. Insurance Brokers. Pending before the court are cross-motions for summary judgment. The court resolves the matters upon the parties' papers and after oral argument. For the reasons set forth below, the court denies summary judgment, except with respect to the counter-claim for reformation.

1

# I. Facts[1]

## A. Background

Regent Air ("Regent") is an aircraft charter company located in Truckee, California. Def.'s Statement of Undisputed Fact ("DSUF") ¶ 6. On March 13, 2002, while attempting to land at Reno, Nevada in snow and freezing fog, one of Regent's aircraft crashed into a commercial building. DSUF ¶ 7. The aircraft and building sustained substantial damage and the pilot and five passengers were injured. Id. Jesse Gallagher was operating the aircraft as the sole pilot at the time of the crash. Id.

Following the crash, plaintiff, an insurance company, paid several million dollars in claims arising from the crash. DSUF ¶ 8. Plaintiff contends that there was no coverage under its policy for the crash and now seeks to recover costs incurred by virtue of the crash from Regent's insurance broker, defendant Gallagher Aviation. DSUF ¶ 9. In short, plaintiff argues that the policy limited coverage for pilots in command to (1) Regent's owner, Gerald Canavan, and (2) others pilots who were properly certified, had completed certain training, and had lodged a specified amount of flight time. There is no dispute that Jesse Gallagher fell into neither of these categories. Defendant, however, argues that it impliedly requested an expansion of coverage to encompass Jesse Gallagher, and that plaintiff's alleged failure to respond to this

---

[1] The facts are undisputed unless otherwise noted.

request obligated them to furnish the requested coverage.[2]

Following the crash, the parties entered into a Dispute Resolution Agreement in which they agreed to attempt to resolve the dispute either informally (which was unsuccessful) or through litigation. DSUF ¶ 50. Plaintiff's claims in the present litigation include breach of contract, negligence, equitable indemnity, and equitable subrogation.[3] Defendant also filed a counterclaim for reformation, alleging that the written policy does not conform to the intent of the contracting parties.

**B. Regent's First Policy (2001-2002)**

In early 2001, Regent procured aviation insurance from plaintiff through its broker, defendant. DSUF ¶ 11. Prior to issuance of coverage, one of plaintiff's underwriters, Daniel Haldeman, visited Regent facilities and flew in an aircraft piloted by both Gerald Canavan and Jesse Gallagher. Depo. of Daniel Haldeman 88:7-9, Ex. 3, Decl. of Christina Nugent. During this trip, the underwriter discussed pilot records and training with Canavan. Id. Contrary to defendant's assertion, however, there is no evidence cited in the record to indicate that they specifically discussed the extent of Gallagher's flying experience.

Following the visit by the underwriter, plaintiff issued a

---

[2] As will be discussed in this opinion, the question of plaintiff's liability is distinct from the issue of whether defendant is obligated to plaintiff.

[3] In the complaint, plaintiff also listed a cause of action for money had and received but has not moved on this claim in its motion.

3

policy of insurance with effective dates of March 3, 2001 to March 3, 2002. DSUF ¶ 16. The 2001-2002 policy contained a "pilot warranty" that essentially limited coverage to Canavan and other pilots meeting certain experience requirements. DSUF ¶ 17. There is no dispute that Gallagher did not have the requisite experience to qualify him as a pilot in command based on the written policy. DSUF ¶ 18. Accordingly, under the express terms of the 2001-2002 policy, Gallagher could fly as a co-pilot but not as a pilot in command. DSUF ¶ 19.

Geoff Logan was the insurance broker for defendant at all relevant times to the lawsuit. Pl.'s Statement of Undisputed Fact ("PSUF") ¶¶ 1, 3. He admitted that he was unaware of the actual terms of the pilot warranty and instead believed (until some time after the crash) that the coverage extended to pilots "as approved by" Canavan. PSUF ¶¶ 11-14. On at least two separate occasions prior to the crash, Logan incorrectly informed his client, Regent, that it had "as approved by" coverage." PSUF ¶ 17.

**C. Regent's Second Policy (2002-2003)**

In December 2001, nine months into the 2001-2002 policy, defendant sent a completed insurance application to plaintiff. DSUF ¶ 20. Although plaintiff maintains that this application was not used for negotiating the terms of a renewal policy, the box for "Renewal Policy" (as opposed to "A Quotation" and "Insurance Policy") was checked off. Ex. 4, Decl. of Geoff Logan.

The application form expressly distinguished between "Captains" and "Co-pilots," listing each in a separate column.

4

1 DSUF ¶ 23. The completed form listed both Gerald Canavan and Jesse
2 Gallagher as "Captains" and a third person as a "Co-pilot." DSUF
3 ¶ 24. Defendant transmitted this application to plaintiff along
4 with completed pilot questionnaires detailing the experience of
5 each of Regent's pilots, including Jesse Gallagher. DSUF ¶ 25.

6 Plaintiff received the application and pilot questionnaires
7 in December 2001. DSUF ¶ 27. Plaintiff's underwriter, Haldeman,
8 admitted that he did not read the section of the application that
9 stated that Jesse Gallagher was operating Regent's airplanes as a
10 captain. DSUF ¶ 28. Haldeman admitted that if he had read the
11 entire application, he would have checked Gallagher's pilot
12 questionnaire to determine the extent of his experience, but that
13 he would not have listed Gallagher as an approved pilot. DSUF ¶
14 31. Furthermore, Haldeman admitted that he would have contacted
15 the broker, Logan, to inform him that Gallagher did not possess the
16 requisite qualifications. DSUF ¶ 32.

17 Although there was no written policy in effect at the time of
18 the crash,[4] PSUF ¶ 19, an informal binder was in place.[5] Upon
19 receipt of the insurance application, plaintiff provided options
20 for renewal coverage on February 25, 2002 for the March 3, 2002 to

---

[4] The 2002-2003 policy was not issued until April 2002, after the aircraft accident. DSUF ¶ 38.

[5] A "binder" is a "memorandum of the most important terms of the preliminary contract of insurance, intended to give temporary protection pending the investigation of the risk by the insurer or until the issuance of a formal policy. Thus, a binder is an independent contract, separate and distinct from the permanent insurance policy." Ahern v. Dillenback, 1 Cal. App. 4th 36, 47 (1991).

1  March 3, 2003 policy period. PSUF ¶ 21. The relevant option that
2  defendant ultimately selected provided that the renewal policy
3  would, in relevant part, remain the same as the initial policy.
4  Id. ("With the exception of War, Hi-Jacking and Other Perils
5  Coverage, all other Coverages, Terms and Conditions shall remain
6  as per the expiring policy."). Defendant then requested that
7  coverage be bound pursuant to this option.[6] Id. There is no
8  evidence that defendant ever requested "as approved by" coverage.
9  PSUF ¶¶ 22-24.

**D. Dispute Resolution Agreement**

Pursuant to a separate contract, the Dispute Resolution Agreement, plaintiff agreed to pay for claims arising out of the crash. PSUF ¶ 26. To date, plaintiff has paid several million dollars in connection with the accident. DSUF ¶ 8. The Dispute Resolution Agreement states in relevant part: "Broker agrees that, should it later be determined by a court of law . . . that the Policy does not apply to the claims . . . or that the Policy would not so apply but for the representation, or other actions or inactions of Broker . . . Broker shall reimburse Insurer for all such claims paid by Insurer." Agreement at 2. Thus, defendant's liability may exist either because the policy did not apply or application was the result of defendant's representations, actions, or inactions.

---

[6] Defendant, responding to Daniel Haldeman, wrote: "Hi, Dan. Please bind the renewal of the above captioned [Regent Air]. Liab [sic] limit at $5 mm for both ships. Hull value on the A90 to be at $450K. Deducts (all) at $5,000. All else per your quote."

6

**II. Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

> Under summary judgment practice, the moving party
>
> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of

7

summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see also</u> <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); <u>Secor Ltd.</u>, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>see also</u> <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Rand v. Rowland</u>, 154 F.3d 952, 954 (9th Cir. 1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992) (quoting <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>see also</u> <u>Cline v. Indus. Maint. Eng'g & Contracting Co.</u>, 200 F.3d 1223, 1228 (9th Cir. 1999).

1    In the endeavor to establish the existence of a factual
2 dispute, the opposing party need not establish a material issue of
3 fact conclusively in its favor.  It is sufficient that "the claimed
4 factual dispute be shown to require a jury or judge to resolve the
5 parties' differing versions of the truth at trial."  First Nat'l
6 Bank, 391 U.S. at 290; see also T.W. Elec. Serv., 809 F.2d at 631.
7 Thus, the "purpose of summary judgment is to 'pierce the pleadings
8 and to assess the proof in order to see whether there is a genuine
9 need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.
10 Civ. P. 56(e) advisory committee's note on 1963 amendments); see
11 also Int'l Union of Bricklayers & Allied Craftsman Local Union No.
12 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

13    In resolving the summary judgment motion, the court examines
14 the pleadings, depositions, answers to interrogatories, and
15 admissions on file, together with the affidavits, if any.  Rule
16 56©; see also In re Citric Acid Litigation, 191 F.3d 1090, 1093
17 (9th Cir. 1999).  The evidence of the opposing party is to be
18 believed, see Anderson, 477 U.S. at 255, and all reasonable
19 inferences that may be drawn from the facts placed before the court
20 must be drawn in favor of the opposing party, see Matsushita, 475
21 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,
22 655 (1962) (per curiam)); See also Headwaters Forest Def. v. County
23 of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).  Nevertheless,
24 inferences are not drawn out of the air, and it is the opposing
25 party's obligation to produce a factual predicate from which the
26 inference may be drawn.  See Richards v. Nielsen Freight Lines, 602

9

F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. Analysis

Pending before the court are cross-motions for summary judgment. Plaintiff argues that the terms of the binder control coverage, and that those terms indicate that only Gerald Canavan or pilots meeting the qualifications set forth in the written policy were covered. Defendant, however, responds that when it submitted the renewal application, it disclosed that Jesse Gallagher would be acting as a pilot in command and that he did not meet the requisite qualifications. Because plaintiff did not specifically deny coverage for Jesse Gallagher, defendant maintains that there is an ambiguity in coverage that must be construed in its favor. The court agrees. Nevertheless, as explained below, there are issues of fact that preclude summary judgment.

**A. Coverage**

    **1. Source of Coverage**

The threshold issue presented by plaintiff's claims is the source of coverage, if any, on March 13, 2002, the date of the crash. There is no dispute that the crash fell outside plaintiff's

10

first policy, which expired on March 3, 2002. Likewise, there is no dispute that the crash also fell outside plaintiff's second policy -- at least insofar as that policy was governed by a formal written contract -- because the 2002-2003 policy was not issued until after the accident. Accordingly, any coverage for the crash, if it is to exist at all, would need to arise from either an insurance binder or an alleged duty to respond to a request for insurance.

Because the parties had apparently agreed to the essential terms of coverage for the second policy period even though the formal policy had not been issued, a binder was in effect at the time of the crash. A binder is a temporary, preliminary contract of insurance. Parlier Fruit Co. v. Fireman's Fund Ins. Co., 151 Cal. App. 2d 6, 19-20 (1957). Binders exist because "if the applicant could not be made secure until all the formal documents were executed and delivered, the beneficial effect of the insurance system would be greatly impaired." Id. at 20. Whether the undisputed facts establish the existence of a binder is a question of law. Adams v. Explorer Ins. Co., 107 Cal. App. 4th 438, 451 (2003).

Here, plaintiff quoted an option for renewal coverage on February 25, 2002, which defendant accepted on March 1, 2002. The pertinent option stated that "With the exception of War, Hi-Jacking and Other Perils Coverage, all other Coverages, Terms and Conditions shall remain as per the expiring policy." PSUF ¶ 21. Defendant accepted Haldeman's quote: "Hi, Dan. Please bind the

11

renewal of the above captioned [Regent Air] . . . per your quote." Id. There is no doubt that this exchange evinced the parties' intent to enter into a binder of insurance.

### 2. Terms of Coverage

Nevertheless, a question remains as to the precise terms of coverage contained in the binder. Defendant argues that the renewal application is part of the binder. Furthermore, it alleges that the application requested an expansion of coverage from the previous term, that plaintiff failed to respond, and that because of this failure, plaintiff should be required to furnish the insurance as requested. See Barrera v. State Farm Mutual Automobile Ins. Co., 71 Cal. 2d 659, 673 (1969) ("Since insurance companies are held to a broader legal responsibility than are parties to purely private contracts, having solicited and obtained an application for insurance, and having received payment of a premium, they are bound either to furnish indemnity or decline to do so within a reasonable time.").

Defendant's argument that it requested "expanded" coverage does not fully tell the story since in fact it incorrectly informed Regent that it possessed "as approved by" coverage on at least two occasions. PSUF ¶ 17. Nevertheless, whether or not the coverage requested was an "expansion" is immaterial, because the real issue is that defendant wanted coverage for Jesse Gallagher in 2002-2003 (whether or not it had such coverage in 2001-2002) and that plaintiff failed to act upon this request.

Plaintiff argues that it did, in fact, respond to the request, albeit unintentionally. Because the renewal option stated that "all other Coverages, Terms and Conditions shall remain as per the expiring policy," plaintiff contends that a response that sets forth the complete terms of coverage for the renewal necessarily responds to any requested change in coverage. While plaintiff's argument has formal appeal, the response was opaque: it would not alert a reasonable person that the particular request for coverage had been denied.

Furthermore, when faced with an ambiguity, the court has a duty to construe policies to "protect the objectively reasonable expectations of the insured." Boghos v. Certain Underwiters at Lloyds, 36 Cal. 4th 495, 501 (2005). More precisely, the rule is that ambiguities are resolved against the party who caused the uncertainty to exist -- in other words, the drafter. See County of San Diego v. Ace Prop. & Cas. Ins. Co., 37 Cal. 4th 406, 415 (2005).

In the typical case, the drafter of the policy is the insurer. Here, however, no formal policy was in effect, and the binder is comprised of statements by both the insurer and insured. Nevertheless, because insurers are under a general duty to respond to requests for insurance,[7] Barrera, 71 Cal. 2d at 673, and the

---

[7] This is true even though, as plaintiff points out, there is no general duty to investigate a pilot's qualifications. See, e.g., Fireman's Fund Ins. Co. v. Superior Ct., 75 Cal. App. 3d 627, 631-37 (1977). Furthermore, here, there was no need for plaintiff to conduct any additional investigation because the renewal application, on its face, disclosed that Jesse Gallagher did not

13

"all other Coverages" language incorporated the previous policy -- which was drafted by the insurer -- any ambiguity here must be resolved in favor of defendant. Accordingly, the court finds that plaintiff was obligated under the terms of the binder to pay for claims arising from the crash.

**B. Claims**

    **1. Negligence**

With this in mind, the court turns to plaintiff's claims. First, plaintiff moves for summary judgment on its claim for negligence. The basic elements of a negligence action are that (1) defendant had a legal duty to plaintiff, (2) defendant breached this duty, (3) defendant was the proximate and legal cause of plaintiff's injury, and (4) plaintiff suffered damage. See Cal. Civ. Code § 1714; Ladd v. County of San Mateo, 12 Cal. 4th 913, 917 (1996).

Here, the court previously determined in its December 5, 2006 order that defendant owed plaintiff a limited duty to convey accurate information to Regent Air. Furthermore, defendant breached this duty by misinforming Regent Air of the terms of its coverage during the first policy period, which then created the ambiguity surrounding the second policy period. Additionally, there is no dispute that plaintiff suffered damage by virtue of paying for the claims associated with the crash.

There is, however, a genuine dispute as to the issue of causation, or alternately formulated, comparative negligence.

---

meet the relevant pilot qualifications.

14

Although defendant had a duty to convey accurate information to its principal because of the foreseeable consequences to plaintiff of breaching that duty, a reasonable fact-finder could conclude that plaintiff similarly had a duty to read the renewal application and respond to the request for Jesse Gallagher's coverage. Had plaintiff responded to Gallagher's request, the ambiguity in the binder would likely have been avoided. In any event, the apportionment of liability between plaintiff and defendant is a question for the jury. Accordingly, the court denies both parties' motion for summary judgment with respect to the issue of negligence.

### 2. Breach of Contract

Plaintiff has also brought a claim for breach of contract, alleging that defendant has violated the Dispute Resolution Agreement. That agreement expresses the parties' intention to shift the costs arising out of the accident from plaintiff to defendant in the event a court determines that coverage would not have existed but for defendant's conduct, or that there was no coverage at all. As discussed above, however, whether coverage would have existed but for defendant's negligence turns on a question of fact -- i.e., whether plaintiff was contributorily negligent -- which precludes summary judgment. Accordingly, both parties' motions are denied with respect to the breach of contract claim.

### 3. Equitable Subrogation

1   Equitable subrogation is appropriate where the insurer has
2 compensated the insured for a loss, and the insured would have had
3 an assignable cause of action against the actual wrongdoer for the
4 loss if it had not already been compensated for it by the insurer.
5 See Transcontintal Ins. Co. v. Ins. Co. of State of Pennsylvania,
6 148 Cal. App. 4th 1296, 1305 (2007).  A claim for equitable
7 subrogation permits the court to shift the costs of a loss from the
8 insurer to the actual wrongdoer where the latter was primarily
9 liable for the loss.  See Maryland Cas. Co. v. Nationwide Mut. Ins.
10 Co., 81 Cal. App. 4th 1082, 1088-89 (2000).
11   Here, plaintiff maintains that it should be allowed to stand
12 in the shoes of Regent, the insured, because Regent's agent,
13 defendant, was the actual wrongdoer. Nevertheless, it is not clear
14 that defendant was the actual wrongdoer.  It has been held that
15 equitable subrogation "will never be enforced when the equities are
16 equal or the rights not clear."  Fireman's Fund Ins. Co. v. Morse
17 Signal Devices, 151 Cal. App. 3d 681, 686 (1984) (internal
18 quotations omitted).  Because there is a genuine issue as to
19 plaintiff's own negligence, the court denies both parties' motions
20 with respect to the equitable subrogation claim.
21   **4. Equitable Indemnity**
22   Plaintiff's final claim is for equitable indemnity, which
23 relates to the allocation of loss among multiple tortfeasors. "The
24 right depends on the principle that everyone is responsible for the
25 consequences of his or her own wrong, and if others have been
26 compelled to pay damages which ought to have been paid by the

16

wrongdoer, they may recover from him or her." Fireman's Ins. Fund Co. v. Haslam, 29 Cal. App. 4th 1347, 1353-54 (1994).  Here, however, the same issues of fact that bar summary judgment for the other claims also bar summary judgment on the equitable indemnity claim.  Despite their name, equitable indemnity claims often turn on issues of fact.  See Martin v. County of Los Angeles, 51 Cal. App. 4th 688, 698 (1996) ("[A] cause of action for equitable indemnity is a legal action seeking legal relief.  As such, the [party] was entitled to a jury trial.").  Accordingly, the court denies both parties' motions with respect to the equitable indemnity claim.

### 5. Counter-Claim for Reformation

Defendant has also brought a counter-claim for reformation, alleging that after it received the written quotation for the second policy period, Haldeman orally informed Logan that the new policy would provide "as approved by" coverage.  Discovery has, apparently, failed to produce any evidence to support this allegation, as even Logan does not remember having any such conversation.[8]  PSUF ¶ 22.  Accordingly, the court grants plaintiff's motion for summary judgment with respect to the counter-claim for reformation and denies defendant's motion with respect to the same.

### IV. Conclusion

---

[8] In any event, in light of the court's findings with respect to the scope of coverage created by the binder, the counter-claim is likely moot.

17

1    For the reasons set forth above, the court DENIES plaintiff's
2 motion for summary judgment with respect to the claims for
3 negligence, breach of contract, equitable subrogation, and
4 equitable indemnity. The court GRANTS plaintiff's motion with
5 respect to defendant's counter-claim for reformation. The court
6 DENIES defendant's motion for summary judgment in full.
7    IT IS SO ORDERED.
8    DATED: June 7, 2007.

_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT